Filed 4/14/16  P. v. Fitzgerald CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066926 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE327557) |
| CONRAD LEONARD FITZGERALD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Conrad Leonard Fitzgerald of four counts of committing a lewd act upon a child (Pen. Code, § 288, subd. (a); counts 1-4)[1] and further found Fitzgerald had substantial sexual conduct with D.F.,[2] a child under 14 years of age, in committing these felonies (§ 1203.066, subd. (a)(8)).[3]  The court sentenced Fitzgerald to prison for a total term of eight years (the upper term of eight years for count 1 plus concurrent terms of eight years each for counts 2-4).

Fitzgerald appeals contending (1) the court abused its discretion in admitting the testimony of Fitzgerald's daughter regarding an uncharged offense and (2) he had ineffective assistance of counsel because his attorney did not seek to preclude the testimony of Fitzgerald's daughter on the ground she disclosed details of the molestation by her father after undergoing a therapeutic process known as eye movement desensitization and reprocessing (EMDR).  We disagree with both contentions and affirm the judgment.

---

[1]     Further statutory references are to the Penal Code unless otherwise indicated.

[2]     For consistency and to protect the identity of the victim and other complaining witnesses, we refer to the witnesses by their first names or initials.

[3]     After the jury was unable to reach verdicts on counts 5 and 6 as to alleged victim T., the court declared a mistrial on those counts and later dismissed them on the People's motion in the interest of justice.

BACKGROUND

A

*Incident with D.F.*

Fitzgerald dated Linda when they were in college.  They lost touch when Linda lived out of state.  However, they reconnected in 1999 and Fitzgerald stayed on Linda's property in El Cajon, California, from time to time over many years in his car or in the barn.  He also stayed on a boat he and Linda owned together.  Fitzgerald was treated as part of the family, which included Linda's ex-husband, their children and grandchildren, many of whom lived in the home.  Linda's daughter, D.F., had known Fitzgerald since she was very young.  He was like a father to her.

When D.F. was 11 years old, Fitzgerald, Linda, and D.F. watched a movie on a portable DVD player in Fitzgerald's car, pretending they were at a drive-in theater. Fitzgerald and Linda sat in the front seat and D.F. sat in the back seat covered under a blanket.  D.F. was wearing a T-shirt and sweat pants.  Before the movie was over, Linda left the car and went inside because she had to be at work early the next morning.  D.F. moved from the back seat to the front passenger's seat and covered herself with the blanket again before falling asleep.

D.F. awoke to find Fitzgerald leaning over the center console and hovering over her.  The blanket, her pants, and her underwear were down by her ankles.  Fitzgerald held a flashlight in one hand, which was pointed towards her vagina.  Her legs were open and Fitzgerald had one of his fingers in her vagina.  D.F. turned away from Fitzgerald onto her side and pretended she was asleep.

3

Fitzgerald turned D.F. back, forced her legs open, and put his finger in her vagina again while she continued to pretend to sleep. When D.F. turned away again, Fitzgerald grabbed her thigh and turned her back a second time. This same sequence occurred again. Fitzgerald penetrated D.F.'s vagina four times with his finger and each time moved his finger up and down.

After the fourth time Fitzgerald placed his finger in her vagina, D.F. pretended to wake up. She pulled up her pants, grabbed the blanket and went into the house. She was hurt physically and emotionally. D.F. avoided spending time alone with Fitzgerald after the incident. D.F. did not tell her mother about the incident because she was scared.

Years later, in 2012, D.F. participated in a self-expression leadership program in which the participants were encouraged to work through hardships they had experienced. A woman in the program shared her abuse story and it made D.F. feel she should talk about the incident with Fitzgerald. D.F. told her cousin about the experience with Fitzgerald. D.F. reported she was watching a movie with her mother and Fitzgerald and D.F. fell asleep after her mother left. D.F. said, while she was sleeping, Fitzgerald reached over and put his hand on her. He "got as far as he could" until D.F. jolted. D.F. asked her cousin not to tell anyone.

A couple of months later, D.F. told her best friend. With her best friend at her side, D.F. told the rest of her family. Thereafter, D.F. reported the incident to the police.

4

# B

## *Pretext Call*

When San Diego County Sheriff's Detective Robert Cross, the primary investigating officer, spoke to D.F. she was tearful, upset, and embarrassed. Later, Detective Cross asked her if she would be willing to make a pretext call to Fitzgerald, which would be monitored and recorded by the police. D.F. agreed.

D.F. telephoned Fitzgerald in February 2013. Fitzgerald asked why she was calling. D.F. said she had taken a class and needed to talk to him. When Fitzgerald asked how she obtained his number, she said she found it in her mother's phone. Fitzgerald questioned why Linda would have his number and again asked, "Why are you calling?" D.F. told Fitzgerald she needed to talk about what happened a long time ago when she was in his car after her mother went into the house. Fitzgerald said he did not know what she was talking about. D.F. said she learned in a class about taking responsibility and she thought Fitzgerald should do so. She said it was embarrassing for her.

When Fitzgerald asked D.F., "What do you want me to do?" D.F. said she wanted him to say he was sorry. Fitzgerald asked D.F. whether anyone knew she was calling him, because he could "get in a lot of trouble, you know that, right?" When D.F. said she had not told her mother, Fitzgerald said, "Well, please don't, please. Whatever it was. I'm sorry, it was a long time ago, and I'm sorry, so sorry." Fitzgerald continued to plead for D.F. not to tell anyone saying, "Anything else I can do for you, you just let me know,

5

… . But please don't." D.F. asked Fitzgerald if he was sorry for the night he hurt her. Fitzgerald said, yes and he loved her and she was like a daughter to him.

D.F. told Fitzgerald she was worried he would hurt his grandchildren. Fitzgerald said he would not and said, "I'm so sorry, please forgive me. You know I love you. You're like a daughter to me." D.F. asked Fitzgerald why he hurt her. She explained, she was not asleep when he thought she was. She said she turned away and he turned her back over. She asked, "didn't you see that, like, I didn't want to do it[?]" Fitzgerald responded, "Please forgive me, please. I'm sorry. If I could change it I would."

When D.F. asked why he used his finger, Fitzgerald said he did not remember using his finger. When D.F. told Fitzgerald he put his finger in her vagina, Fitzgerald denied it and said he did not remember doing so. He finally said he remembered "looking but not, I don't remember touching."

D.F. told Fitzgerald she wanted him to take responsibility for what he did. Fitzgerald said he did, but continued to say, "Please don't tell anybody." Fitzgerald said he would do "whatever [he could] to help [her] through this." When she said he needed not to do this to people, he said he knew and he "thought about it yeah, all the time. I just, you know, I don't know what to do to change it."

Fitzgerald promised he would not do this to his granddaughters or anyone else. He said he wanted to talk later so he could "explain it more." Fitzgerald asked to talk another day and said "let's just chill out. And we'll talk and try to settle this." When D.F. asked Fitzgerald if he remembered that night, he said "I think so." Fitzgerald said they needed to talk, but he could not do it then and asked her again not to talk to anyone.

6

Fitzgerald then said everything would be fine, "I'm sorry.  Really I am.  I am.  I am.  I am."

*Fitzgerald's Interview Statements*

After the pretext call was completed, two detectives went to Fitzgerald's home in Sun City Riverside, California, and placed him under arrest.  The detectives transported Fitzgerald to the sheriff's station in Vista, California, where they interviewed him after reading him his rights.

Fitzgerald said D.F. was like a daughter to him and she was six years old when he moved to the property.  Detective Cross told Fitzgerald that D.F. accused him of touching her inappropriately.  Fitzgerald denied touching her in the car.  He said he remembered the blanket fell off of her and he bent down to get the blanket.  He said she had a skirt on.  When she woke up and asked what he was doing, he said "Nothing baby."  He picked up the blanket and put it on her.

Detective Cross told Fitzgerald that D.F. said Fitzgerald had a flashlight in one hand and put his finger in her vagina.  Fitzgerald said, "Oh no . . . .  I have to deny that.  I'm gonna deny that."  Fitzgerald said he would not be surprised if Linda was "not behind this whole thing" because she is "spiteful."

Detective Cross told Fitzgerald he was giving him an opportunity to apologize to D.F.  Fitzgerald said he did apologize, but he did not remember touching her.  Detective Cross told Fitzgerald that D.F. was awake and was aware of what happened to her.  D.F. thought about it for years before coming forward.  Fitzgerald stated he did not touch her.

7

Fitzgerald said he "might have looked you know, or something like that but [he] never touched her and [he] never penetrated."

Detective Cross urged Fitzgerald to be honest and asked him what happened in the car that night. Fitzgerald said he had a portable DVD player he would place on the dashboard in his car. He and D.F. would watch it together. Linda would tell him D.F. wanted to watch television. He said "Nothing really happened" when he was alone with D.F. in the car. He said D.F.'s blanket fell off of her. He had a flashlight, found the blanket, and was putting it on her when she woke up. She asked him what he was doing and he said, "nothing baby." He said he might have looked up her dress, but he never touched her. When Detective Cross asked what prompted him to do that, Fitzgerald's posture changed and he responded, "I have no idea, bro." He was crying during this exchange and then asked about going to jail.

Detective Cross told Fitzgerald that T. said Fitzgerald had engaged in sexually explicit text messages with her when she was 17 years old. She also said she allowed Fitzgerald to "finger" her. Fitzgerald did not deny texting with her, but he denied touching her.

Detective Cross said Fitzgerald's daughter, C.F., told him Fitzgerald also put his finger in her vagina when she was a child. She said she woke up to find Fitzgerald standing over her, he tried to put his tongue in her mouth and then he put his fingers in her mouth. Fitzgerald denied it saying, "I never touched my daughter. Are you kidding me? This is a joke." Fitzgerald said he and his daughter had a rocky relationship and

8

described her as "kind of evil."  He said, "she can lie all she wants.  My daughter's done that before."

## D

### *Uncharged Conduct*

#### 1

When Trina was 16 years old, she boarded her horse at the barn on Linda's property, where Fitzgerald ran a horse and boarding facility.  Fitzgerald and Linda also owned a horse kept at the facility.  Trina went to the barn almost every day after school.  She and her twin brother would visit the horses and hang out with Fitzgerald.  She considered Fitzgerald a friend.

Fitzgerald made comments to Trina that made her feel uncomfortable.  He told her he wished she was 18 years old, she had "a nice butt," and he would like to have a girl like her.  Trina thought Fitzgerald was "a little bit of a pervert" because he was always thinking about sex.  He made comments about how hot her mother and her friends were, how they looked good and their "butts" looked good.  Fitzgerald touched Trina's buttocks once.

#### 2

Fitzgerald's daughter, C.F., was born in 1984.  She lived with Fitzgerald, her sister, and her brother in Fontana, California from 1994 to 1998.  C.F. and her sister shared a bedroom with bunk beds.  C.F. had the bottom bunk.  When she was 11 or 12 years old, she woke up in the middle of the night with her father on top of her.  He was in the bed hovering over her.  Fitzgerald licked her tongue and touched her vagina over her

9

underwear.  C.F. shook her head from side to side.  C.F. disassociated from her body and felt as though she was watching the events unfold from the corner of the room.

The next morning, she was confused and afraid to come out of her room.  When she went into the kitchen, her father looked at her and she thought she should act like nothing happened.  So she smiled, pretended nothing had happened, and went about her day.  She did not tell anyone because she did not think anyone would believe her and she did not want to accept that it happened.  She told herself it was all a bad dream.

When C.F. was 18, she told her aunt about the incident.  She needed to tell someone because the incident haunted her.  It was like a tape constantly playing in the back of her head.  She also told a couple of her college friends and her mother.  She did not tell the police because she did not think anyone would believe her.

In 2005 and 2006, when she was 21, C.F. went to therapy because she still found the incident overwhelming and because it was all she could think about.  She needed to process it and move on with her life.  C.F. felt it difficult to speak about what happened and to describe the bits and pieces she remembered.  "When I would speak about it, it just made it real. … I hadn't wanted to acknowledge or accept it.  When I said it out loud, it just hurt to say it."  Although she doubted her memory because she did not want to believe her father would do this to her, she had the memories in her head.

At some point during therapy, she participated in a process called EMDR.  This process involved touching different pressure points on her body as she recalled a memory and describing her feelings on a scale of one to 10.  She described it as "a process of saying it several times, and each time that I went through that motion, the emotion would

10

decrease" until she could accept it happened and let it go. The purpose of the treatment was to help her not have the memory loop constantly playing in her head. During the therapy session, C.F. discussed the two memories of her father licking her tongue and touching her vagina.

C.F. testified she was always clear something happened, but she was unclear about the exact details and she would go back and forth about accepting what happened to her. She coped by telling herself it was a bad dream.

In 2010, C.F. learned her father was accused of sending text messages to T. C.F. told Linda she was not surprised and told her what Fitzgerald had done to her. She asked Linda not to tell anyone.

C.F. learned in 2012 that D.F. told the police Fitzgerald had sexually assaulted her. C.F. chose to come forward to the police about the incident with her father after she learned about what Fitzgerald had done to D.F. Although C.F. wanted to report the incident with her father for a long time, she was scared she would not be believed. After learning about D.F., she thought about her nieces and thought she could not forgive herself if she did not say anything and something happened to them.

E

*Additional Evidence*

1

T. testified she stayed with Linda and her family for a few months during her senior year in high school, when she was 17 years old. She was dating Linda's son. She met Fitzgerald, who was living in the barn. Fitzgerald was flirty and would make

11

comments to her. He would wink at her and whisper flirty things to her. When she would sweep, he would walk by closely and rub his hand on her buttocks. He also grabbed her breast.

T. also testified there was one instance when Fitzgerald put his fingers inside her vagina, under her skirt and underwear, when they were in the barn together. T. exchanged text messages of a sexual nature with Fitzgerald after she moved out of the house, but while she was 17 years old. He asked her via text message to have sex and oral sex with him.

2

Linda provided the police detective with Fitzgerald's cellular phone. Several photographs were extracted from the phone. One was named "Cheerleader Up Skirts" and depicted two cheerleaders bending over a car in very short skirts with their panties, buttocks, and back areas visible. A second was named "Japanese School Girls" and showed a group of five Japanese girls wearing school uniforms with short skirts. A third picture, entitled "Japanese School Girls. White Cotton Panties Up Skirts," depicted a school girl sitting on the ground with her knees together exposing her vaginal area and buttocks beneath tight fitting white panties.

3

Catherine McLennan, a social worker and a child abuse forensic interviewer, testified as an expert in delayed disclosure. McLennan testified that more often than not sexually abused children take a long time to disclose the abuse. Studies show two-thirds of adults who were abused sexually as children did not mention the abuse to anyone

when they were children and most told no one at all. Of the one-third who did make a disclosure, most talked to another child or a family member and it was not reported to authorities.

Victims do not disclose for reasons such as feelings of loyalty towards the abuser, rewards from a continued relationship with the abuser, and fear the disclosure will have a negative impact on their life. A child is more likely to disclose right away if something happens with a stranger because the child is not bonded to the person and disclosure will not change his or her life. However, when the abuser is part of the family children worry about what will happen to the family if the abuser is taken away. They do not necessarily want the abuser to be removed or taken away from the home. "They want the behavior to stop." Victims may become motivated to make a disclosure when she or he becomes worried about siblings, wants to start a romantic relationship, or the abuser is no longer in his or her life so they feel more safe in disclosing. McLennan also testified it is not unusual for a perpetrator to choose one child when others are available in a family. Studies and victim statements indicate abusers choose a child who is cooperative and compliant.

F

*Defense Evidence*

C.M., Fitzgerald's younger daughter, testified C.F. never slept alone in their room when C.F. and C.M. lived with their father in Fontana, California. She never saw Fitzgerald in bed with C.F. C.M. stated they received bunk beds in the winter of 1997 when C.M. was 12 years old and C.F. was 13 years old.

13

Around August 2010, C.M. received a call from Linda telling her Fitzgerald had moved out of Linda's home. When C.M. was living in another state with her husband and father, C.M. overheard a telephone conversation between Fitzgerald and Linda in which Linda said "You need to come back to San Diego; otherwise, I will call the police and tell them that you are a pedo[ph]ile."

Linda visited C.M. in 2012 to help C.M. with her new baby. Linda asked C.M. if her father had ever molested her, to which C.M. responded, "You are crazy. Never." Linda referred to Fitzgerald as a pedophile and mentioned he had engaged in text messages with T. Linda said Fitzgerald had ruined her life and she wanted to see to it she did the same for him. C.M. ended the relationship with Linda after that visit.

DISCUSSION

I

*Admission of Uncharged Conduct*

Fitzgerald contends the court erred in admitting evidence of an uncharged sex offense against his daughter, C.F., and the admission of this evidence violated his constitutional right to due process. We disagree.

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion. [Citations.] Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

14

Evidence Code section 1108 is a legislative exception to the general rule prohibiting character evidence in the form of specific acts. (Evid. Code, § 1101; *People v. Callahan* (1999) 74 Cal.App.4th 356, 367.) In enacting Evidence Code section 1108, " 'the Legislature "declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness." ' " (*Callahan*, *supra*, at p. 367.) " 'Our elected Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*People v. Falsetta* (1999) 21 Ca1.4th 903, 911 (*Falsetta*).)

The Supreme Court in *Falsetta* rejected a due process challenge to Evidence Code section 1108 concluding the "trial court's discretion to exclude propensity evidence under [Evidence Code] section 352 saves [Evidence Code] section 1108 from defendant's due process challenge." (*Falsetta*, *supra*, 21 Cal.4th at p. 917.) This is so even in the case of an uncharged offense. (*People v. Villatoro* (2012) 54 Ca1.4th 1152, 1165-1166.)

The *Falsetta* court explained the Legislature's principal, and practical, justification for adopting Evidence Code section 1108: "By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. [Evidence Code section]

15

1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta*, *supra*, 21 Ca1.4th at p. 915.) This bears on the "probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." (*Id.* at p. 912, internal quotations marks omitted.)

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se, but must engage in a careful weighing process under [Evidence Code] section 352." (*Falsetta, supra,* 21 Ca1.4th at pp. 916-917.) "Specifically, the court weighs factors such as the 'nature, relevance, and possible remoteness [of the evidence], the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 41.) " 'This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*Falsetta*, *supra*, at pp. 917-918.)

In this case, the court engaged in a careful weighing process as required by Evidence Code sections 352 and 1108. The court considered the proximity of the alleged crimes and concluded the uncharged acts against C.F. in 1994 were not too remote when compared to the charged acts in 2006 against D.F. and 2010 acts alleged against T. The court concluded the proposed testimony from C.F. was very similar to the charges by

16

D.F. Both girls were 11 or 12 years old when they were awakened with Fitzgerald on top of them and digitally penetrating their vaginal area. Fitzgerald was C.F.'s father and was a father figure to D.F. The court considered the possibility the testimony would be prejudicial and the fact C.F. is Fitzgerald's biological daughter could be inflammatory. However, after engaging in the required balancing, the court concluded "the probative value clearly outweighs the possible prejudice." We find no abuse of discretion and "conclude that defendant has failed to carry his burden of rebutting the strong presumption of admissibility of the sexual assault crimes evidence under Evidence Code section 1108. " (*People v. Merriman*, *supra*, 60 Cal.4th at p. 42.)

The court instructed the jury regarding the limited purpose of the uncharged offense evidence regarding C.F.[4] This instruction, "combined with the fact that the

---

[4] The court instructed the jury with CALCRIM No. 1191 as follows: "The People presented evidence that the defendant committed crimes not charged in this case. The testimony of [C.F.] was presented for the purpose of proving that the defendant committed the uncharged crime of lewd act on a child under 14. … [¶] I have given you a definition of a description of the elements and the definition of the crime of lewd act on a child under 14. … You may consider this evidence of the uncharged offense[] only if the people have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offense.

"This is this one area where I told you there is a different level of proof than proof beyond a reasonable doubt. The level here is preponderance of the evidence. … [¶] If you decide that the defendant committed an uncharged offense you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision also conclude that the defendant was likely to commit the crimes charged in this case. Specifically, lewd act upon a child. … If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of any of the charged crimes. [¶] The people must still prove each charge, the charged offense beyond a reasonable doubt. Do not consider this evidence of an uncharged offense for any other purpose except for the purpose I just described."

17

impact of the prior offense[] was no more egregious than the charged offense ... foreclosed the risk the jury would consider the evidence for a prohibited purpose." (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 969.)

II

*Ineffective Assistance of Counsel*

Fitzgerald contends his trial counsel was ineffective for failing to object to the admission of C.F.'s testimony on the basis that her memories of the molestation were recovered as a result of EMDR therapy. Fitzgerald contends EMDR therapy is a new and novel scientific technique and information obtained using this therapy should not be admissible without establishing it is generally accepted as reliable in the scientific community. (*People v. Shirley* (1982) 31 Cal.3d 18, 54 (*Shirley*).) We again disagree.

To establish ineffective assistance of counsel, a defendant has the burden to show counsel's performance fell below the standard of reasonableness under prevailing professional norms and the attorney's deficient performance was prejudicial, i.e., the defendant would have obtained a more favorable result absent the alleged error. (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-217.) " 'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof ... must be a demonstrable reality and not a speculative matter.' " (*People v. Karis* (1988) 46 Cal.3d 612, 656.) We must give deference to the tactical decisions of trial counsel. (*People v. Mayfield* (1993) 5 Cal.4th 142, 199.) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349.)

18

In *Shirley*, *supra*, 31 Cal.3d 18, the Supreme Court held "the use of hypnosis for the purpose of 'refreshing' a witness's memory generally was not accepted as a reliable practice in the scientific community" and "because of the strong likelihood that hypnosis would lead to false memories and an inability effectively to explore the veracity of the witness's recollections upon examination at trial, 'the testimony of a witness who has undergone hypnosis for the purpose of restoring his [or her] memory of the events in issue is inadmissible as to all matters relating to those events, from the time of the hypnotic session forward.' [Citation.] In 1984, however, the Legislature enacted section 795 of the Evidence Code, which allows the admission of testimony of a witness who has been hypnotized if certain conditions are satisfied." (*People v. Alexander* (2010) 49 Cal.4th 846, 879 (*Alexander*), fns. omitted.)

The *Alexander* court explained the "holding in *Shirley*, that use of hypnosis to 'refresh' a witness's memory was not accepted generally as a reliable practice in the scientific community and that a witness who had undergone hypnosis therefore should not be permitted to testify regarding the subject of the hypnosis, rested on the rule for the introduction of scientific evidence set forth in *Frye v. U.S.* (D.C. Cir. 1923) 54 U.S. App.D.C. 46. [Citation.] The touchstone of the *Frye* test, and [the] holding in *Shirley*, is the 'reliability' of the proffered scientific evidence. [Citation.] When a witness actually has not been hypnotized in any meaningful way, despite attempts to do so, the concerns expressed in *Shirley* regarding reliability of the witness's testimony, namely, introduction of false memories and the tendency for the witness to develop unjustified confidence in recollections, are not at issue. The reliability of such a witness is that of any other

19

witness, and the ensuing testimony similarly would be subject to a credibility attack based on circumstances surrounding the witness's recollections." (*Alexander*, *supra*, 49 Cal.4th at p. 882.) The *Alexander* court concluded the trial court in that case did not abuse its discretion in allowing testimony from a witness who was never successfully placed under hypnosis and, therefore, was never placed "in a state of 'heightened suggestibility'." (*Id.* at pp. 882-884.)

Here, C.F. did not undergo hypnosis, she underwent EMDR therapy, which Fitzgerald acknowledges was developed to help individuals who suffer from post-traumatic stress disorder to deal with traumatic memories, not to assist recovery of forgotten or repressed memories. As Fitzgerald also acknowledges, no published California case has applied Evidence Code section 795 to testimony related to EMDR therapy.

Even if Evidence Code section 795 could apply to EMDR therapy, the record does not indicate C.F. recalled new or different memories as a result of EMDR therapy. To the contrary, C.F. testified she thought about the molestation for years and her memories played constantly, like a loop, in the back of her head. Although C.F. tried to cope with the memories by telling herself it was a dream and she doubted her memories, she testified she always had them in her head.

C.F. explained the EMDR process. "I would tap different pressure points in my body; for example, say, I have this memory, and on a scale of 1 to 10, right now I am feeling nauseous or scared or this particular emotion. Even though I feel this way, and this happened a long time ago[,] I accept it happened, and I am willing to let it go, and

20

then I would move to a different pressure point. It would be a process of saying it several times, and each time that I went through that motion, the emotion would decrease."

When asked if she recalled certain memories during the EMDR process, C.F. responded by saying, "It was recalling two of the memories that I mentioned earlier, when my father licked my tongue and when he touched my vagina." In context of C.F.'s explanation about the therapeutic process she underwent, we cannot conclude her statement indicates her memories were recalled *as a result* of the EMDR therapy. Rather, she recalled two specific painful memories during the therapy to reduce her anxiety and stress related to those memories so, as she said, she could accept them and move on.

This understanding of her testimony is supported by her responses on cross-examination to questions about whether or not she had a clear awareness of the molestation. C.F. stated she did not recall a lot of details and went back and forth about whether or not she accepted what she did recall. However, she stated "I always have been clear that something happened. What I am unclear about is exact details. [¶] . . . [¶] I remember what I remember."[5]

Given the state of the evidence, we cannot conclude Fitzgerald's counsel fell below reasonable professional norms in failing to move to exclude C.M.'s testimony

---

[5] This testimony is in sharp contrast to the facts presented in the military appeals court case relied upon by Fitzgerald, *United States v. D.W.B.* (N-MCT.Crim.App. 2015) 74 MJ 630. In that case, the patient had no conscious memory or recall of the abuse before EMDR therapy and the conditions under which the therapist conducted the EMDR treatment were suggestive and called into serious doubt the accuracy of any resulting memories. The court in that case determined the military judge did not abuse his discretion in excluding the recovered memory testimony as unreliable. (*Id.* at pp. 643-644.) This case is inapposite to the case before us.

21

based on the use of EMDR therapy under Evidence Code section 795. (See *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"]; *People v. Freeman* (1994) 8 Cal.4th 450, 490-491 ["Because the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence"].)

## DISPOSITION

The judgment is affirmed.


MCCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


MCDONALD, J.

22